```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------x

 JOSEF MIZRAHI,

                    Plaintiff,              MEMORANDUM & ORDER
                                             18-CV-3023(EK)(RML)

          -against-

 S.A.N.D. AUTOMOTIVE WAREHOUSE, LLC
 and NATAN ZUBERY,

                    Defendants.

-------------------------------------x
```

ERIC KOMITEE, United States District Judge:

        Plaintiff Josef Mizrahi brought overtime wage claims against his former employer, S.A.N.D. Automotive Warehouse ("SAND"), and its owner Natan Zubery under the Fair Labor Standards Act ("FLSA") and state law. Compl., ECF No. 1. Defendants now move for summary judgment on the basis that Mizrahi's work at SAND rendered him an "outside salesperson" under 29 U.S.C. § 213(a)(1) and therefore ineligible for the protections of the FLSA's overtime pay provisions. For the following reasons, I hold that Mizrahi's work did make him an outside salesperson, even viewing the facts in the light most favorable to him. Defendants' motion therefore is GRANTED.

## I. Background[1]

Mizrahi joined SAND, a Brooklyn-based distributor of automotive motor vehicle parts, supplies, and accessories to repair shops, in or around 1997. Pl. 56.1 ¶¶ 1-2. Prior to that, Mizrahi maintained his own business sourcing automotive parts and supplies and selling them to several repair shops with which he had developed relationships. *Id.* ¶ 2; *see also* Deposition of Josef Mizrahi ("Mizrahi Dep.") 13:23-14:3, ECF No. 31-3.

When Mizrahi joined SAND as an employee, he brought those clients with him. Pl. 56.1 ¶ 4; Def. 56.1 ¶ 6. He followed a relatively consistent schedule: four days per week, he came to the SAND office in Brooklyn for a "couple of hours" in the morning and then visited clients for the rest of the day; one day per week, he visited clients but did not come in to the office. Pl. 56.1 ¶ 8; Mizrahi Dep. 28:21-29:20. One of the "main purposes of [his] job in visiting accounts[] was to get th[ose] repair shop[s] to use SAND as much as possible to buy parts." Mizrahi Dep. 47:22-48:2. It was his duty to "present

---

[1] The facts in this order are drawn from the parties' submissions in connection with the motion for summary judgment, including Defendants' Local Rule 56.1 Statement ("Def. 56.1" (ECF No. 26)), and Plaintiff's opposition ("Pl. 56.1" (ECF No. 31-1)). The facts are viewed in the light most favorable to Plaintiff, the non-moving party. Citations to a party's Rule 56.1 Statement incorporate the documents cited therein. For convenience, Defendants' supporting memorandum of law will be referred to as "Def. Br." (ECF No. 25); Plaintiff's opposition as "Pl. Opp." (ECF No. 31); and Defendants' reply brief as "Def. Reply" (ECF No. 32).

sales materials to the repair shops," *id.* at 48:8-10, as well as to maintain personal relationships with clients to ensure that they came to SAND with their orders.  Def. 56.1 ¶¶ 8-9; *see* Mizrahi Dep. 47:22-48:2.  If a given customer's orders decreased, it was Mizrahi's responsibility to "review . . . that situation" with the customer and come up with solutions to "get the business back."  Mizrahi Dep. 54:10-23; Def. 56.1 ¶ 26. Clients often placed orders with SAND directly, but sometimes they would place their orders through Mizrahi.  Def. 56.1 ¶ 23; *see* Mizrahi Dep. Tr. 50-52.

      The parties agree that sales to Mizrahi's clients were to be credited to his account regardless of whether they came through Mizrahi or directly.  Def. 56.1 ¶ 24; Mizrahi Dep. 52:14-18.  They also agree that Mizrahi's commissions were to be calculated from all such sales.  Def. 56.1 ¶¶ 5, 24; *see* Mizrahi Dep. 22:21-23:6, 56:25-58:4.  Although the parties disagree over whether SAND fully complied with their compensation agreement, they largely agree on the structure of that agreement, pursuant to which Mizrahi was paid eleven percent of the "gross net profit" from sales on his accounts.  Def. 56.1 ¶ 5; *see* Mizrahi Dep. 22:24-23:6.

      Mizrahi's employment with SAND ended in or about November 2017.  Pl. 56.1 ¶ 3; Def. 56.1 ¶ 4.  He filed this action on May 22, 2018, alleging violations of the FLSA and New

3

York Labor Law ("NYLL"), and breach of contract. He claims that he regularly worked in excess of forty hours per week, but was not paid for those hours or paid at the proper overtime rate. He also claims Defendants breached his employment agreement by withholding commissions and failed to comply with the NYLL's notice and recordkeeping requirements. Compl., ECF No. 1.

## II. Legal Standard

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). "A fact is material for these purposes if it might affect the outcome of the suit under the governing law. An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 212 (2d Cir. 2001).[2]

The moving party has the burden of demonstrating the absence of a dispute of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). If the movant carries its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact

---

[2] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). If the non-moving party fails to do so, the Court should grant summary judgment. In performing this analysis, the Court must resolve all ambiguities and draw all inferences in favor of Plaintiff, the non-moving party. *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994).

### III. Discussion
**A. FLSA Claim**

Plaintiff alleges that Defendants failed to pay him for hours he worked in excess of forty per week, in violation of the FLSA. "Congress enacted the FLSA in 1938 with the goal of protecting all covered workers from substandard wages and oppressive working hours." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 147 (2012). As relevant here, "the FLSA obligates employers to compensate employees for hours in excess of 40 per week at a rate of 1½ times the employees' regular wages." *Id.*; *see* 29 U.S.C. § 207(a)(1). However, the statute expressly exempts "any employee employed . . . in the capacity of outside salesman." 29 U.S.C. § 213(a)(1).

Congress "delegated authority to the [Department of Labor ("DOL")] to issue regulations from time to time to define and delimit" the term "outside salesman." *Christopher*, 567 U.S. at 147. The current DOL definition is as follows:

5

> (a) The term "employee employed in the capacity of outside salesman" in section 13(a)(1) of the Act shall mean any employee:
>
> > (1) Whose primary duty is:
> >
> > > (i) making sales within the meaning of section 3(k) of the Act, or
> > >
> > > (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and
> >
> > (2) Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.

29 C.F.R. § 541.500(a). The term "sale" is further defined in section 3(k) of the FLSA to include "any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." 29 U.S.C. § 203(k).

Part of the "apparent purpose" of this exemption was to distinguish

> employees [who] performed a kind of work that was difficult to standardize to any time frame and could not be easily spread to other workers after 40 hours in a week, making compliance with the overtime provisions difficult and generally precluding the potential job expansion intended by the FLSA's time-and-a-half overtime premium.

*Christopher*, 567 U.S. at 166. The DOL has "stressed" that the exemption's application "should not depend on technicalities, such as whether it is the sales employee or the customer who types the order into a computer system and hits the return button, or whether the order is filled by a jobber rather than

6

directly by the employee's own employer." *Id.* at 149, 149 n.9. Previously narrowly construed, that is no longer the case; courts now "have no license to give the exemption anything but a fair reading." *Vasto v. Credico (USA) LLC*, 767 F. App'x 54, 56 (2d Cir. 2019); *see also Encino Motorcars, LLC v. Navarro*, 138 S.Ct. 1134, 1142 (2018) ("Those exemptions are as much a part of the FLSA's purpose as the overtime-pay requirement.").

The outside salesperson exemption applies here. The undisputed facts show that Mizrahi was an employee whose "primary duty [was] making sales within the meaning of [the FLSA]," and that he was "customarily and regularly engaged away from the employer's place or places of business in performing such primary duty." 29 C.F.R. § 541.500(a). I address each prong in turn.

### 1. Sales as the Primary Duty

The first question is whether the Mizrahi's job description met the standard in Section (a)(1) of the DOL regulation — essentially, whether his "primary duty" was "making sales" or obtaining orders." 29 C.F.R. § 541.500(a)(1). This determination is to be made "based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a). The DOL has identified four non-exclusive factors relevant to this determination: (1) "the relative importance of the exempt duties

7

as compared with other types of duties"; (2) "the amount of time spent performing exempt work"; (3) "the employee's relative freedom from direct supervision"; and (4) "the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id.*; *see Domenech v. Parts Authority, Inc.*, 653 F. App'x 26, 27 (2d Cir. 2016). Further, "work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall be regarded as exempt outside sales work," and "[o]ther work that furthers the employee's sales efforts also shall be regarded as exempt" — "including, for example, writing sales reports, updating or revising the employee's sales or display catalogue, planning itineraries and attending sales conferences." 29 C.F.R. § 541.500(b); *see Domenech*, 653 F. App'x at 27-28.

All four factors weigh decisively in favor of the conclusion that Mizrahi's primary duty was making sales. *First*, as to the relative importance of his exempt and non-exempt duties, there is no question that making sales was at the core of Mizrahi's role. Mizrahi's own deposition testimony is replete with his acknowledgements that he visited customers, presented them with sales materials, and nurtured personal relationships with clients, all in an effort to ensure "that the

8

orders will come to S.A.N.D." Mizrahi Dep. 47:22-50:15. Indeed, the record reveals no indication that Mizrahi had any substantial job duties *unrelated* to making sales. Even when he was actually in the office, he would do things like prepare statements showing the amount a client owed to SAND, or any credits they received; if a client paid during a visit, Mizrahi would then take the money and deliver it to another SAND employee the next morning. Def. 56.1 ¶ 25; *see* Mizrahi Dep. 53:4-20. In sum, any time he was not actually making sales was spent performing work "incidental to and in conjunction with the employee's own outside sales or solicitations" or "[o]ther work that furthers the employee's sales efforts." 29 C.F.R. § 541.500(b).

      Mizrahi attempts to draw a distinction between sales, on the one hand, and "relationship" management, on the other. *See* Pl. Opp. ¶ 18 ("Mr. Mizrahi could not be clearer when he gave his primary duty at SAND as 'customer relationship[s]'."); *see also id.* (referring to his efforts to "schmooze" customers). This distinction does not find support in the case law. Mizrahi points to *Amendola v. Bristol-Myers Squibb Co.*, 558 F. Supp. 2d 459 (S.D.N.Y. 2008). There, the plaintiffs – pharmaceutical representatives – did promotional work but did not conduct any sales or obtain binding commitments. *Id.* at 470-71. Mizrahi, on the other hand, was authorized to make sales and did; he

testified that although clients often called SAND to place their orders directly, they also placed orders with him.  Mizrahi Dep. 51:24-52:17.  Moreover, the Supreme Court abrogated *Bristol-Myers* in *Christopher*, where it held that "pharmaceutical sales representatives whose primary duty is to obtain nonbinding commitments from physicians to prescribe their employer's prescription drugs . . . qualify as 'outside salesmen.'" *Christopher*, 567 U.S. at 147.

*Second*, Mizrahi spent the majority of his time visiting clients to make sales.  "Employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement."  29 C.F.R. § 541.502; *e.g.*, *Tortorici v. Bus-Tev*, LLC, No. 17-CV-7507, 2021 WL 4177209, at *2 (S.D.N.Y. Sept. 14, 2021) ("[N]o reasonable juror could conclude that Plaintiff's non-sales duties accounted for more than 50% of his job duties—particularly because Plaintiff admits that they took less than half of his work time.").

Mizrahi testified that four days per week, on average, he would get to the office at around 7:45 a.m. and spend "about an hour and a half to two hours daily to do the paperwork" there before leaving to visit customers.  Mizrahi Dep. 27:12-28:8.  He would then travel to visit customers from around 9:30 a.m. to 6:00 p.m.  Pl. 56.1 ¶ 7; Def. 56.1 ¶¶ 10-11, 13-14; Mizrahi Dep. 28:10-18.  On Tuesdays, Mizrahi generally did not come into

10

SAND's office at all. Instead, he would collect the necessary paperwork for his Tuesday clients on Monday, and then spend all day Tuesday visiting his Staten Island clients. Mizrahi Dep. 28:21-29:20. As discussed above, the purpose of those visits was to generate sales. Thus, Mizrahi spent the majority of his time performing exempt work.

*Third*, Mizrahi had significant discretion to set his own schedule and was free of direct supervision. He decided when to be in the office and when to visit clients, and he had the discretion to determine which clients to visit when. Mizrahi Dep. 27:15-21. For example, he testified that he generally scheduled visits with clients who lived close to his home for the end of the day, and that he did not return to the SAND offices at the end of the workday. Mizrahi Dep. 65:4-65:8.

*Fourth*, Mizrahi's pay was based *exclusively* on commissions from sales made to SAND's clients. Def. 56.1 ¶ 5; *see* Mizrahi Dep. 22:24-23:6. One of the "hallmark activities" of an outside salesperson is to "generate[] commissions for himself through his work." *Veracka v. MLD Mortg. Inc.*, 16-CV-7152, 2021 WL 2662007 (E.D.N.Y. Apr. 1, 2021); *see also, e.g.*, *Flood v. Just Energy Mktg. Corp.*, 904 F.3d 219, 234 (2d Cir. 2018) (the fact that plaintiff's "entire compensation was from commissions he earned when he convinced customers to obtain

11

their energy from" his employer was a "powerful indici[um] that [he] was indeed a salesman").

Mizrahi acknowledged that SAND never paid him an hourly wage; he testified that his compensation was structured to incentivize him to make as many sales as possible, as opposed to working as many hours as possible. Def. 56.1 ¶ 5; Mizrahi Dep. 22:24-23:6. Mizrahi testified that during his last six years at SAND, his payment structure was as follows: SAND paid him $1,100 per week, Mizrahi Dep. 22:24-23:6; then, at the end of each month, SAND would calculate eleven percent of the gross profit from sales on Mizrahi's accounts that month; if that amount was less than $4,400 (four weeks of $1,100 payments), the difference would be deducted from Mizrahi's pay; if it was more than $4,400, the excess would be paid to him in a monthly check. *Id.* at 57:1-58:13. "This relatively consistent commission-oriented compensation structure suggests that Plaintiff was indeed 'making sales' for purposes of the outside sales exemption analysis and was compensated as a salesperson." *Tortorici*, 2021 WL 4177209, at *8.

2. Away from Employer's Place of Business

Mizrahi does not meaningfully dispute that his duties meet the "outside" element of Section (a)(2) of the DOL's regulation — that is, that he was "customarily and regularly engaged away from the employer's place or places of business in

12

performing [his] primary duty." 29 C.F.R. § 541.500(a)(2). He testified that his schedule included approximately an hour-and-a-half to two hours at SAND's offices four days a week, followed by approximately eight-and-a-half hours visiting clients each day. Mizrahi Dep. 28:3-13. And Tuesdays, he did not come into the office at all, instead visiting clients "away" from SAND's premises. *Id.* at 27:25-29:9. This schedule is extremely similar to one that met the exception in *Flood*, 904 F.3d at 224. Flood arrived at his employer's offices between 9:30 a.m. and 10:00 a.m. and left to make door-to-door solicitations by around 12:30 p.m. *Id.* There, like here, the employee "spent about 75-80% of his time with [his employer] making door-to-door solicitations, mostly with residential customers." *Id.* The Second Circuit held that the outside salesperson exception applied. *Id.*

For the foregoing reasons, Mizrahi's work at SAND clearly qualified for the outside-salesperson exemption.

**B.    State-Law Claims**

In addition to his FLSA claim, Mizrahi brings state-law claims under the NYLL and for breach of contract. Because I dismiss the FLSA claim — the sole basis for federal jurisdiction in this case — I decline to exercise supplemental jurisdiction over his remaining state-law claims. 28 U.S.C. § 1367(c)(3); *see also Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 56 (2d Cir.

13

2004) ("[O]ur Court has held, as a general proposition, that if [all] federal claims are dismissed before trial, the state claims should be dismissed as well.").

### IV. Conclusion

For the reasons stated above, I grant the Defendants' motion for summary judgment. Plaintiff's claim under the Fair Labor Standards Act is dismissed, and I decline to exercise supplemental jurisdiction over his state-law claims.  The Clerk of Court is respectfully directed to enter judgment and close the case.

SO ORDERED.

   /s/ Eric Komitee
ERIC KOMITEE
United States District Judge

Dated:   September 23, 2022
        Brooklyn, New York